UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DARLA MCCULLOUGH, | : | |
| Administratrix of the Estate of | : | |
| JOHN MILFORD MCCULLOUGH, | : | |
| | : | |
| Plaintiff, | : | |
| | : | JURY TRIAL DEMANDED |
| v. | : | |
| | : | NO.: _____ |
| CLINTON COUNTY, | : | |
| WELLPATH, LLC, | : | (JUDGE _____) |
| JEREMY SHANK, | : | |
| LIEUTENANT MUTHLER, | : | |
| OFFICER ETTERS, OFFICER KING, | : | |
| OFFICER YOUNG, WILLIAM | : | |
| DETTERLINE, and CHRISTINA | : | |
| MAZZULLA, | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Darla McCullough, Administratrix of the Estate of John Milford McCullough ("Mr. McCullough"), by and through her attorneys, Barry H. Dyller, Chad J. Sweigart and Dyller & Solomon, LLC, brings this action related to the violations of Mr. McCullough's protected rights and in support thereof, Plaintiff alleges as follows:

## JURISDICTION AND VENUE

1.     This action arises out of violations of the United States Constitution brought pursuant to 42 U.S.C. § 1983, the Americans with Disabilities Act, 42 U.S.C.

1

§ 12101, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 794, *et seq*.

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

3.      Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## THE PARTIES

4.      Plaintiff is Darla McCulough ("Mrs. McCullough" and/or "Plaintiff") as the Administratrix of the Estate of her late husband, Mr. McCullough, acting pursuant to Letters of Administration issued to her by the Clinton County Register of Wills on April 26, 2022.

5.      At the time of his death on October 26, 2021, Mr. McCullough was an adult individual domiciled in Clinton County, Pennsylvania.

6.      Defendant Clinton County (the "County") is a municipality in Pennsylvania and owns and controls the Clinton County Correctional Facility ("CCCF").

7.      Defendant Wellpath, LLC ("Wellpath") is, based on information and belief, a corporation headquartered in Tennessee and organized under the laws of Delaware that, at all times relevant hereto, contracted with the County to provide medical services at CCCF.

8.    By virtue of its role performing correctional facility medical care, the acts of Wellpath and of its employees are under color of state law.

9.    Defendant Jeremy Shank was at all times relevant hereto employed by the County as a correctional officer at CCCF.

10.    Defendant Muthler was at all times relevant hereto employed by the County as a lieutenant at CCCF.

11.    Defendant Etters was at all times relevant hereto employed by the County as a correctional officer at CCCF.

12.    Defendant King was at all times relevant hereto employed by the County as a correctional officer at CCCF.

13.    Defendant Young was at all times relevant hereto employed by the County as a correctional officer at CCCF.

14.    Defendant William Detterline was at all times relevant hereto a nurse employed by Wellpath who provided medical services at CCCF.

15.    Defendant Christina L. Mazzulla was at all times relevant hereto a nurse employed by Wellpath who provided medical services at CCCF.

## FACTUAL BACKGROUND

16.    Mr. McCullough, born April 10, 1973, was a lifelong resident of Lock Haven, Pennsylvania.

17.    In July 1994, Mr. McCullough and Mrs. McCullough were married, which they remained until Mr. McCullough's death on October 26, 2021.

18.     In the final year of his life, Mr. McCullough became increasingly agitated, angry and depressed, which ultimately culminated in Mrs. McCullough obtaining an emergency protection from abuse order on October 14, 2021.

19.     Pursuant to the October 14, 2021 order, Mr. McCullough was required to relinquish all firearms to the Clinton County Sheriff's Office.  Nonetheless, Mr. McCullough retained a single shotgun.

20.     The next day, October 15, 2021, Mrs. McCullough reported to the Pennsylvania State Police that Mr. McCullough violated the terms of the protection from abuse order.

21.     That same day, Mr. McCullough was charged with contempt for violation of a protection from abuse order pursuant to 23 Pa. C.S.A. § 6114(a).

22.     Mr. McCullough was not detained or arrested at that time.

23.     Three days later, on October 18, 2021, a 302 application for involuntary emergency examination and treatment of Mr. McCullough was submitted by a family member.

24.     911 was called and local police and troopers from Pennsylvania State Police-Lamar arrived at the McCullough house in Lock Haven to find Mr. McCullough barricaded in his home.

25.     Mr. McCullough had personal articles laid out including family pictures and his birth certificate.

26.     Mr. McCullough also had a loaded shotgun with plans to kill himself.

27.    Mr. McCullough had also expressed an intention to kill Mrs. McCullough with himself so she was not left behind.

28.    In other words, Mr. McCullough was homicidal-suicidal.

29.    Mr. McCullough was ultimately convinced to leave the home without further incident, and he was transported by troopers from Pennsylvania State Police-Lamar to the emergency room at UPMC Williamsport.

30.    At UPMC Williamsport, Mr. McCullough's history of present illness noted that he presented with "depression, suicidal ideation with intent to shoot himself.  Patient reports that had not been for the police involvement he would have committed suicide by gunshot."

31.    Mr. McCullough's history of present illness went on to say that "it has gotten to the point now where he feels hopeless and helpless wanted to end his life."

32.    Upon evaluation in the emergency room at UPMC Williamsport, Mr. McCullough was noted to have "[d]epressed mood tearful suicidal ideation with intent to shoot himself" and "[d]epression suicidal ideation with plan 302 warrant."

33.    Mr. McCullough was evaluated pursuant to the 302 application at approximately 12:40 p.m. on October 18, 2021 and found to have "plans to shoot himself" and to be in need of "inpatient psychiatric care."

34.    Mr. McCullough was also found to be "severely mentally disabled and in need of treatment.  He should be admitted to a facility designated by the County Administration for a period of treatment not to exceed 120 hours."

35.     In the early morning hours on October 20, 2021, Mr. McCullough was transferred from UPMC Williamsport to UPMC Altoona, where he was noted to have been "on 302 for suicidal ideation."

36.     Mr. McCullough was discharged from UPMC Altoona and transferred to CCCF on October 22, 2021.

37.     According to the CCCF Central Processing Data Sheet for Mr. McCullough that was completed on October 22, 2021 at 3:02 p.m. by a Clinton County Sheriff's Office employee, Mr. McCullough was "suicidal/thoughts self harm."

38.     When Mr. McCullough was committed to CCCF, the County and Wellpath were also provided a personal crisis and safety plan for Mr. McCullough.

39.     That personal crisis and safety plan documented that Mr. McCullough was being treated for depression.

40.     Upon arrival at CCCF, the County and Wellpath along with their staff, officers and nurses were informed that Mr. McCullough was being incarcerated pursuant to a charge of violating a protection from abuse order.

41.     The County and Wellpath along with their staff, officers and nurses also knew that Mr. McCullough had been committed under a 302 order with suicidal ideations following the events that took place on October 18, 2021 during which he threatened to kill himself and/or others.

42.     When Mr. McCullough arrived at CCCF, a medical receiving triage form was completed for Mr. McCullough and signed by Nurse Christina L. Mazzulla

at 3:07 p.m. on October 22, 2021.

43.     In the medical receiving triage, Mr. McCullough was documented to have "displayed bizarre or aggressive behavior" and that there was "a reason to believe that arrestee may be suicidal, dangerous to himself or others."

44.     Despite this observation, Nurse Mazzulla did not place Mr. McCullough on suicide watch.

45.     Instead, Nurse Mazzulla found Mr. McCullough was "[c]leared to book, proceed with Medical Intake Triage."

46.     Nurse William Detterline completed a receiving screening for Mr. McCullough on October 22, 2021 at 10:30 p.m.

47.     With respect to "monitoring," although "suicide watch" was an option, Nurse Detterline checked "other" for Mr. McCullough's monitoring status.

48.     As to "placement/housing recommendation," Nurse Detterline selected "General Population (GP)."

49.     Nurse Detterline further documented that Mr. McCullough needed an urgent (but not emergent) mental health referral.

50.     Nurse Detterline also noted that Mr. McCullough had a psychiatric history, but he answered no to the questions "expresses thoughts about killing self" and "has a suicide plan and/or suicide instrument in possession;" however, Nurse Detterline added the following comment: "no attempt but had thoughts and possible plan, but no method to carry-out plan."

7

51.     Nevertheless, despite the opportunity to do so, Nurse Detterline did not place Mr. McCullough on suicide watch even though he indicated the need for an urgent mental health referral.

52.     Mr. McCullough was booked into the prison by Officer Jeremy Shank.

53.     According to the facility admission report prepared by Officer Shank, Mr. McCullough was classified as a pretrial detainee.

54.     Officer Shank assigned Mr. McCullough to holding cell 2, which, based on information and belief, is a recorded cell.

55.     The facility admission report was completed and signed at 7:12:11 p.m. on October 22, 2021.

56.     Along with the facility admission report, Officer Shank also completed a personal property intake for Mr. McCullough and provided Mr. McCullough with a hygiene kit.

57.     Officer Shank also prepared a receipt of bedding for Mr. McCullough, which confirmed that Mr. McCullouch "received a mat, **2 sheets**, and 1 blanket."

58.     Mr. McCullough was assigned to holding cell two by Officer Shank and he was given a mat, a blanket and two sheets.

59.     Providing a sheet to an inmate who has expressed suicidal ideation is thus an invitation to commit suicide.

60.     It is well known that inmates commit suicide by using sheets as a ligature to hang themselves.

61.     A behavioral authorization approval form was also completed for Mr. McCullough indicating that he was placed on "Behavioral Observation Level B" with no razor, and he was to be "checked a minimum of every 30 Minutes. These checks will be documented/recorded."

62.     Besides the razor restriction, Mr. McCullough was otherwise entitled to "[a]ll property and privileges as general population."

63.     The behavioral authorization form does not identify who authored the document, and the line next to "Approved by" is blank.

64.     Nurse Detterline also electronically signed a separate receiving screening report on October 23, 2021 at "0449."

65.     That report indicated that Mr. McCullough had current psychotropic medication and had a "history of psychiatric hospitalization" within the "Last Seven Days."

66.     Additionally, the October 23, 2021 screening states with respect to "mental health" that Mr. McCullough had "Acute Problems – IMMEDIATE Referral (Psychosis, Suicidal)."

67.     Yet, despite the need for "IMMEDIATE" referral for mental health reasons, Nurse Detterline did not ensure Mr. McCullough was seen by a mental health professional nor did he place Mr. McCullough on suicide watch and instead left Mr. McCullough in "General Population (GP)."

68.     Based on information and belief, despite Nurse Detterline indicating that

Mr. McCullough needed an immediate referral for psychosis and suicidality on October 23, 2021 and an urgent need for mental health referral the day before, Mr. McCullough was never referred to a mental health professional while at CCCF.

69.     On October 24, 2021, at approximately 3:30 p.m., medical staff was called to holding cell two for an incident with Mr. McCullough.

70.     Specifically, based on a report by Mr. McCullough's cellmate, Mr. McCullough purportedly "fell" out of the top bunk and hit his head on the ground.

71.     At 3:31 p.m., Officer King called for medical to respond to intake.

72.     As charted by Nurse Cathy Perry, she was "called out to Intake Cell 2 when arrived detainee was laying on his back on the floor cell mate said he fell off top bunk.  Detainee laid there with his eyes closed no verbal response just quietly crying and moaning.  Unable to move R arm or body.  VS 157/99, 93, 20, 97, 5, 99%.  Lt. Blazina was present with COs.  EMS called arrived on scene detainee was placed in neck brace and on back board he did tell them he was having R shoulder and R hip pain transported to JJH via ambulance."

73.     At 4:37 p.m., Mr. McCullough departed CCCF via ambulance to Geisinger's Jersey Shore facility accompanied by Correctional Officer Shoemaker. Correctional Officer King followed in a separate vehicle.

74.     When this incident was reported to Lock Haven EMS, "staff: state[d] they had watched the security cameras and state they saw the patient fall out of bed, but were unable to give further information. **Patient was in intake for a 'short time'**

**so staff did not have a proper medical history of the patient.** Unknown if the patient lost consciousness."

75. At Geisinger Jersey Shore, Mr. McCullough was diagnosed with vocal cord paralysis (primary) and contusions on the head, right hip and right shoulder and upper arm.

76. Mr. McCullough was discharged from Geisinger Jersey Shore at 8:16 p.m. on October 24, 2021 and he was returned to CCCF.

77. Upon returning to CCCF, Nurse Detterline noted in Mr. McCullough's chart: "follow up appointment with ENT for possible vocal chord paralysis."

78. Given Mr. McCullough's injuries to his neck and the unclear circumstances in which those were sustained on October 24, 2021, Mr. McCullough, based on information and belief, had attempted to injure himself that day.

79. Specifically, the injury to Mr. McCullough's neck suggests that Mr. McCullough had tied ligature around his neck in an attempt to kill himself.

80. Yet, Nurse Detterline did not place Mr. McCullough on suicide watch after he returned from Geisinger Jersey Shore.

81. Rather, Mr. McCullough was returned to behavioral watch and put in classification cell four.

82. Classification cell four is a recorded cell that is under constant video surveillance.

83. At no time either before or after his trip to Geisinger Jersey Shore was

11

Mr. McCullough placed on suicide watch despite his pre-incarceration behaviors and the statements and observations as documented in hospital, Wellpath and CCCF records from October 2021.

84.     Instead, Mr. McCullough was on the less-restrictive behavioral watch.

85.     Despite being on behavioral watch and in a cell under constant video observation, Mr. McCullough, in the early morning hours of October 26, 2021, hung himself from a pipe in classification cell four with a bed sheet.

86.     Mr. McCullough's death was recorded on video.

87.     At the time of Mr. McCullough's death, Lieutenant Muthler and Correctional Officers Etters, King and Young were on duty and tasked with monitoring Mr. McCullough.

88.     According to a CCCF extraordinary occurrence report completed by Lieutenant Muthler, the chronological order of Action/Events from October 26, 2021 were as follows:

> 0248: Detainee McCullough sits up in his cell, takes a drink, proceeds to cell door, looks up at something, then lays back down
>
> 0256: McCullough sits up in his bunk, looks at door, and then lies back down on his bunk
>
> 0258: McCullough takes the sheet he is using a [sic] pillow and starts twisting it while lying in bed
>
> 0300: McCullough sits up in bed looks around the room, looks at the camera, walks up to the inner solid cell door wedges it tight to the wall then stands at the cells grill door

0302: McCullough takes the sheet off the bed, slings it up over the solid door, climbs up the outer cell grill door, and kneels on top of the solid inner cell door apparently tying the sheet to the electrical conduit

0303: McCullough is now on top of the inner solid cell door out of view of the camera

0306: McCullough slides his legs down the door and he is now sitting on top of the inner solid cell door

0307: McCullough slides himself off the door at this time hanging himself with a sheet around his neck

0333: McCullough, John was found hanging in his cell and all units were summoned

0334: LT Muthler grabs 911 tool

0335: LT Muthler, CO King, and CO Young arrive at cell 4 in classification

0336: CO Etters arrives at cell 4 classification

0336: McCullough was cut down and immediately began receiving CPR

0342: Medical arrives on scene

0342: Nurse Beaver advised Central to call 911

0350: EMS (Emergency Medical Services) arrived at gate

0354: EMS arrived at intake

0409: Fire department in

0413: PSP (Pennsylvania State Police) in

0420: EMS exit intake, find McCullough to be clinically

dead

0426: EMS exit gate

0428: Fire department exits gate

0500: Lock Haven Hospital informs LT Muthler that McCullough is deceased

89.   These scenes are recorded on video.

90.   In other words, even though Mr. McCullough was on behavioral watch and in a video monitored cell, he was able to hang (with a County provided sheet) for *twenty-six minutes* without any County or Wellpath employee taking notice.

91.   While Mr. McCullough hung on video for nearly a half hour, Lieutenant Muthler and Correctional Officers King, Etters and Young were nowhere to be found.

92.   Officer Etters, based on information and belief, was one of the officers responsible for conducting checks of Mr. McCullough at the time he hung himself based on the fact that Officer Etters had conducted the previous 18 checks of Mr. McCullough from 6:15 p.m. on October 25, 2021 until his check of Mr. McCullough at 2:57 a.m. on October 26, 2021.

93.   But, instead of checking on Mr. McCullough or monitoring the video feed in Mr. McCullough's cell, Officer Etters was "out getting a milk delivery . . . ."

94.   Mr. McCullough was not cut down until 3:36 a.m., twenty-nine minutes after he first slid himself off the inner cell door, and thirty-eight minutes after video shows him fastening a noose from a sheet.

14

95.   Medical staff, *i.e.*, Nurse Beaver, took an additional six minutes to get to Mr. McCullough's cell at 3:42 a.m.

96.   Stunningly, despite having been found hanging at 3:33 a.m., EMS was not called until Nurse Beaver advised Central Control to call 911 at 3:42 a.m.

97.   At 4:20 a.m., EMS found Mr. McCullough to be clinically dead.

98.   Mr. McCullough was pronounced dead at UPMC Lock Haven at 4:42 a.m.

COUNT ONE
Fourteenth Amendment Deliberate Indifference
Mrs. McCullough v. Defendants Muthler, King, Etters, Young, Shank, Detterline, and Mazzulla
(42 U.S.C. § 1983)

99.   Mrs. McCullough repeats and realleges each and every allegation contained above as if fully repeated herein.

100.   Mr. McCullough, a pre-trial detainee at CCCF, had a particular vulnerability to suicide and demonstrated a strong likelihood that he would attempt suicide.

101.   Indeed, Mr. McCullough was incarcerated at CCCF on October 22, 2021 following a 302 commitment on October 18, 2021 pertaining to the incident during which Mr. McCullough barricaded himself in his home and threatened to commit suicide.

102.   Additionally, Mr. McCullough, based on information and belief,

attempted to kill himself in his cell at CCCF on October 24, 2021 and resulted in his transport to a local hospital where he was diagnosed with vocal chord paralysis.

103.   Mr. McCullough returned to CCCF on October 24, 2021 at or about 8:15 p.m., at which time he was in a recorded cell -- classification cell 4.

104.   Despite being on behavioral watch and in a recorded cell, Mr. McCullough was still able to commit suicide within thirty-two hours of being placed in classification cell 4.

105.   Prison officials, namely Officer Shank, gave Mr. McCullough the ligature used to commit suicide -- a bed sheet.

106.   Further, Mr. McCullough was placed in a cell with an obvious tie off point -- an exposed pipe or electrical conduit.

107.   All Individual Defendants knew of Mr. McCullough's particular vulnerability to suicide as they were all aware that Mr. McCullough had been incarcerated at CCCF following his 302 commitment related to suicidal activity.

108.   And, Defendants Lieutenant Muthler and Correctional Officers King, Etters and Young all knew Mr. McCullough was vulnerable to suicide on October 26, 2021 because Mr. McCullough was on behavioral watch.

109.   Individual Defendants were recklessly indifferent to Mr. McCullough's particular vulnerability to suicide.

110.   Specifically, notwithstanding the information provided at intake and the contents of his prison and medical records reflecting current and recent signs of

suicidality, none of the Individual Defendants referred or recommended Mr. McCullough be placed on suicide watch at any point during his four days at CCCF.

111.   By failing to do so, all Individual Defendants were deliberately indifferent to Mr. McCullough's vulnerability to suicide.

112.   Despite all the signs of suicide exhibited by Mr. McCullough during the days preceding October 26, 2021 and even though he was in a recorded cell, Mr. McCullough was able to take a bed sheet, sling it over the door, climb up the outer grill door, kneel on top of the inner cell door, tie the sheet to the conduit or pipe above the door, position himself on top of the inner cell door and slide himself down the door without being noticed by any on-duty staff member.

113.   Defendants' reckless indifference is further reflected by the fact that Mr. McCullough was provided a sheet both when he first entered CCCF and allowed to keep a sheet in classification cell 4 after returning from the hospital on October 24, 2021 -- the item he used to take his own life -- instead of a knot-free suicide blanket.

114.   Lieutenant Muthler and Correctional Officers King, Etters and Young were deliberately indifferent to Mr. McCullough's constitutional rights when, despite knowing of Mr. McCullough's suicidal tendencies, they failed to observe him or monitor the recording in his cell for over thirty minutes.

115.   Nurse Detterline was deliberately indifferent to Mr. McCullough's constitutional rights when, despite knowing of Mr. McCullough's suicidal tendencies, he had Mr. McCullough placed in General Population and did not ensure Mr.

McCullough was seen by a mental health specialist (even though Nurse Detterline twice noted that Mr. McCullough needed an urgent or immediate referral for mental health reasons).

116.  Similarly, Nurse Mazzulla was deliberately indifferent to Mr. McCullough's constitutional rights upon his entry at CCCF.

117.  Nurse Mazzulla was aware of Mr. McCullough's risk of self-harm and his bizarre behavior, but she did not place Mr. McCullough on suicide watch, did not restrict his access to ligature that could be used to commit suicide, did not refer Mr. McCullough for mental health help and instead simply cleared Mr. McCullough for entry into CCCF.

118.  Nurse Detterline was further deliberately indifferent where, even after Mr. McCullough returned to CCCF after attempting to harm himself, he again failed to place Mr. McCullough on suicide watch.

119.  Upon return to CCCF on October 24, 2021, Nurse Detterline was deliberately indifferent to Mr. McCullough's constitutional rights by allowing him continued access to implements of suicide.

120.  Defendants Lieutenant Muthler, Nurses Detterline and Mazzulla, and Correctional Officers King, Etters, Shank and Young all were therefore deliberately indifferent to Mr. McCullough's rights under the Fourteenth Amendment to the United States Constitution.

121.  As a result of Defendants' violations of Mr. McCullough's

constitutional rights and their deliberate indifference to same, Mr. McCullough suffered the ultimate injury and damage -- death.

COUNT TWO
Fourteenth Amendment Deliberate Indifference
Mrs. McCullough v. The County & Wellpath
(42 U.S.C. § 1983)

122.   Mrs. McCullough repeats and realleges each and every allegation contained above as if fully repeated herein.

123.   The County and Wellpath had policies, customs and/or practices that resulted in the violation of Mr. McCullough's Fourteenth Amendment rights.

124.   Particularly, the County and Wellpath had policies and/or customs and/or practices related to, *inter alia*, insufficient staffing, failing to provide sufficient mental health treatment, failing to train employees on how to manage inmates vulnerable to suicide, and inadequate screening and placement procedures.

125.   The County and Wellpath also had a policy and/or custom and/or practice of denying suicidal inmates with appropriate and necessary items to prevent suicide, including suicide proof clothing and blankets, as well as appropriate living quarters such as suicide-proof cells.

126.   The County and Wellpath also had a policy and/or custom and/or practice of providing all inmates with sheets and blankets without exception.

127.   In other words, the County and Wellpath had a policy and/or custom and/or practice of providing inmates with the ligature to commit suicide even when

those inmates were suicidal and/or observed by staff to require urgent or immediate referral for mental health reasons, such as Mr. McCullough.

128.   The County and Wellpath also had a policy and/or custom and/or practice of failing to appropriately train employees on monitoring inmates while they are on suicide and/or behavioral watch.

129.   Specifically, CCCF has a suicide prevention policy that allows for suicidal inmates to be placed on suicide watch or, alternatively, on a less restrictive behavioral watch.

130.   Based on information and belief, CCCF and Wellpath had a policy and/or custom and/or practice of routinely placing inmates on behavioral watch even when suicide watch was necessary under the circumstances for reasons unrelated to the health, safety and/or well-being of the inmate, such reasons including cost and other non-medical factors.

131.   Thus, the County's and Wellpath's suicide prevention policy was a paper policy alone that was not utilized by County and/or Wellpath employees.

132.   The County and Wellpath also had a policy and/or custom and/or practice of failing to appropriately train employees on applicable policies for the placement of CCCF inmates on suicide and/or behavioral watch.

133.   Such training would have prevented Mr. McCullough's suicide from occurring.  The need for such training was obvious.

134.   Further, based on information and belief, the County and Wellpath had a

policy and/or custom and/or practice of failing to consistently monitor the surveillance video of inmates while inmates were on behavioral watch.

135.   Lastly, based on information and belief, the County and Wellpath had a policy and/or custom and/or practice of not requiring approval for the placement of inmates on behavioral watch given that Mr. McCullough's behavioral authorization approval form is blank in the space provided for "Approved by:_____."

136.   The County's and Wellpath's policies, customs and/or practices were a cause of and moving force behind the violation of Mr. McCullough's Fourteenth Amendment rights.

137.   The County and Wellpath therefore violated Mr. McCullough's Fourteenth Amendment due process rights.

COUNT THREE
Mrs. McCullough v. The County
(Americans with Disabilities Act (Title II))

138.   Mrs. McCullough repeats and realleges each and every allegation contained above as if fully repeated herein.

139.   Mr. McCullough was disabled within the meaning of the Americans with Disabilities Act and the Rehabilitation Act because he was suicidal, had mental health issues and suffered with depression.

140.   As noted by Nurse Detterline on October 23, 2021, Mr. McCullough had a psychiatric history and had acute problems of psychosis and suicidality.

141.   Mr. McCullough's hospital records and his Wellpath/County records

show that Mr. McCullough was on depression/psychiatric medication and he had a recent history of psychiatric hospitalization.

142.   The County denied Mr. McCullough his rights under the Americans with Disabilities Act by failing to accommodate his known disabilities and implement necessary suicide-prevention methods, namely, keeping Mr. McCullough in a suicide smock, providing him a knot-proof suicide blanket, and/or keeping Mr. McCullough in a suicide-proof cell.

143.   The County's choice not to provide Mr. McCullough with reasonable accommodations for his disability constituted discrimination against him on the basis of his disability.

144.   The County knew of Mr. McCullough's disabilities given its knowledge that he suffered from depression, had a recent psychiatric hospitalization and had nearly committed suicide only days earlier.

145.   In addition, Mr. McCullough was regarded as disabled by the County by virtue of its knowledge of his suicidality and his mental health issues discussed above.

146.   Reasonable accommodations for suicidal individuals include suicide-proof clothing and bedding, suicide-proof cells, items to keep warm, frequent checks of inmates, and affirmative determinations that the person is not currently suicidal.

147.   Instead of making these reasonable accommodations, the County did not provide Mr. McCullough with adequate mental health care, did not provide him with suicide-proof clothing and bedding, did not place him in a suicide-proof cell and did

not maintain watch on Mr. McCullough even though he was in a recorded cell.

148.   Despite knowing of the obvious risk of suicide presented by Mr. McCullough, the County ignored these signs, placed him in a room with an obvious tie-off point and provided Mr. McCullough with the sheet he used to kill himself.

149.   The County therefore acted with deliberate indifference to the risk of suicide that Mr. McCullough presented.

150.   As a result of the County's violation of the Americans with Disabilities Act, Mr. McCullough committed suicide.

<u>COUNT FOUR</u>
Mrs. McCullough v. The County
(Rehabilitation Act)

151.   Ms. McCullough repeats and realleges each and every allegation made above as if fully repeated herein.

152.   The County is an entity that receives federal funding.

153.   The County's actions and inactions as described above violate the Rehabilitation Act.

154.   As a result of the County's violation of the Rehabilitation Act, Mr. McCullough committed suicide.

<u>COUNT FIVE</u>
Fourteenth Amendment State-Created Danger
Plaintiff v. The County & Officer Shank
(42 U.S.C. § 1983)

155.   Plaintiff repeats and realleges each and every allegation made above as if fully repeated herein.

156.   Defendants the County and Officer Shank placed Mr. McCullough in a position of danger that he otherwise would not have faced.

157.   Specifically, at the time he was committed to CCCF and at all times over the next four days he was incarcerated at the prison thereafter, Mr. McCullough had two sheets in his possession that were provided by Officer Shank.

158.   Officer Shank provided Mr. McCullough bedding at intake pursuant to County policy that all inmates are provided bedding without exception.

159.   Four days later, Mr. McCullough hung himself with one of the sheets he was given by Officer Shank at intake.

160.   Given Mr. McCullough's suicidal ideations from the days leading up to his incarceration, his harm was foreseeable and fairly direct.

161.   Officer Shank's decision to provide Mr. McCullough with bed sheets was conscious shocking in light of the fact that he was involuntarily hospitalized pursuant to a 302 order for suicidal ideations immediately preceding his commitment to CCCF.

162.   Mr. McCullough was a foreseeable victim of suicide.

163.   Officer Shank's affirmative action to provide Mr. McCullough with bed sheets rendered him more vulnerable to suicide than if he had not acted at all.

164.   By providing Mr. McCullough with bed sheets, Officer Shank facilitated Mr. McCullough's suicide.

165.   The County, based on information and belief, had a policy and/or custom and/or practice of providing newly committed inmates with bed sheets without exception.

166.   Officer Shank and the County affirmatively placed Mr. McCullough in a position of danger that he would otherwise not have faced.

167.   It is conscious shocking to provide a known suicidal person with the implements of suicide.

168.   Officer Shank and the County therefore violated Mr. McCullough's Fourteenth Amendment rights on this basis as well.

WHEREFORE, Plaintiff demands judgment as follows:

A. As to the County, an amount to be determined at trial plus interest;

B. As to Individual Defendants and Wellpath, an amount to be determined at trial, including punitive damages against each of them, plus interest;

C. For plaintiff's attorneys' fees, pursuant to 42 U.S.C. §§ 1988, 12205 and 794a;

D. For the costs and disbursements incurred in this action; and

E.  For such other and further relief as the Court deems just and proper.

DYLLER & SOLOMON, LLC

/s/ Barry H. Dyller, Esq.
/s/ Chad J. Sweigart, Esq.
Attorneys    for    Plaintiff
Gettysburg House
88  North  Franklin  Street
Wilkes-Barre, PA  18701
(570) 829-4860

<u>JURY DEMAND</u>

Plaintiff demands a trial by jury.

Date: January 31, 2023